J-A27036-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| SAGE IFILL | : | |
| | : | |
| Appellant | : | No. 1657 MDA 2021 |

Appeal from the Judgment of Sentence Entered October 5, 2021
In the Court of Common Pleas of Dauphin County
Criminal Division at No(s):  CP-22-CR-0000242-2019

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| SAGE SKYLER IFILL | : | |
| | : | |
| Appellant | : | No. 1658 MDA 2021 |

Appeal from the Judgment of Sentence Entered October 5, 2021
In the Court of Common Pleas of Dauphin County
Criminal Division at No(s):  CP-22-CR-0006633-2017

BEFORE:   DUBOW, J., McLAUGHLIN, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:          **FILED: JUNE 7, 2023**

Sage Skyler Ifill appeals from the judgment of sentence imposed following a consolidated jury trial in which he was found guilty of three counts of rape and three counts of sexual assault.[1] For these offenses, Ifill was

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] **See** 18 Pa.C.S. § 3121(a)(3) (unconscious complainant), and 18 Pa.C.S. § 3124.1, respectively.

sentenced to twenty-two and one-half to forty-five years of incarceration. On appeal, Ifill raises seven issues, chiefly challenging the court's consolidation of the charges that were against him. In addition, Ifill contests the 'excessive' aggregate sentence that he received, questions the sufficiency and the weight of the evidence employed against him, and avers that the Commonwealth failed to demonstrate that he is a sexually violent predator ("SVP"). After a thorough review of the record, we vacate the judgment of sentence and remand for resentencing. However, in all other respects, we affirm.

The jury trial featured testimony from two incidents: one happening on October 15, 2016, and the other occurring on October 15, 2017. Distilling down these events, the trial cogently wrote, as to the facts underpinning the first set of criminal charges, that:

> On the night of October 15, 2016, Jenna McMillen (hereinafter, "Jenna") dropped off Cheyenne Moore (hereinafter, "Cheyenne") at a friend's house. Later the same night, Jenna and Cheyenne met at a bar and restaurant named Arooga's. Jenna testified that Cheyenne appeared to be very intoxicated when she saw Cheyenne at Arooga's. Cheyenne consumed a large amount of alcohol at Arooga's and she cannot remember everything she did or said at Arooga's. Around 2 a.m. on October 16, 2016, Jenna and Cheyenne left Arooga's and drove back to the friend's house. [Ifill had already been present at this friend's house.] Jenna and Cheyenne continued to drink alcohol at the friend's house. Cheyenne began to speak to [Ifill] as they had a friend in common.

> Cheyenne started feeling physically sick and nauseous. She vomits and states that she needs to go to the hospital. [Ifill] sat next to Cheyenne and told her that she just needs to "throw it up." Cheyenne again stated that she felt like she needed to go to the hospital because she had never felt like that before. When Cheyenne stated that she needed a hospital, [Ifill] said "don't take her to the hospital." Jenna stated that she did not see any type of

- 2 -

physical touching between [Ifill] and Cheyenne prior to Cheyenne getting sick.

Approximately half an hour later, Cheyenne disappeared from the lower level of the home. Jenna asked the owner of the home where Cheyenne went, and she stated that Cheyenne was upstairs taking a bath. Cheyenne remembers being in the bathroom, sitting on the toilet, and warm clothes being put on her body. Jenna went upstairs to check on Cheyenne but received no answer when she knocked on the locked bathroom door. After a third knock, [Ifill] answered from inside the locked bathroom that Cheyenne was fine. Jenna knocked again and asked if she was okay and Cheyenne answered that she was okay. Jenna testified that Cheyenne sounded "really groggy and out of it" when she answered through the locked door. Jenna could not hear any water running or water sloshing around. Jenna then asked the homeowner to come and unlock the bathroom door. When Jenna made her way back upstairs, Cheyenne was out of the bathroom and dressed in a bright green or blue long t-shirt and sweatpants. Cheyenne stumbled through the hallway and threw herself onto the homeowner's bed. Jenna asked Cheyenne to leave with her, but Cheyenne stated that she was comfortable on the bed. Cheyenne does not remember how she got to the upstairs bathroom, nor does she remember taking a bath.

When Cheyenne woke up the next morning, she attempted to insert a tampon, but it felt very [uncomfortable] and painful, so she took the tampon out. Cheyenne testified that she did not feel [like] herself and felt that something was off.

The next day, on October 17, 2016, Jenna called Cheyenne to check on her and encourage her to go to the hospital. Cheyenne went to the hospital and had a [sexual assault forensic examiner ("SAFE")] exam, or a rape kit test, completed. During the course of the internal exam, the nurse found a tampon inside of her. This is a tampon that she inserted before going to Arooga's. Cheyenne contacted the police approximately one year later when she saw [Ifill] on the news being charged with multiple counts of rape and sexual assault.

Santiago Steven Soto (hereinafter, "Santiago"), a friend of [Ifill], testified that he was present at the friend's home with Cheyenne, Jenna, and [Ifill]. Santiago testified that Cheyenne appeared to be intoxicated. Santiago testified that he heard sexual

moaning at some point during the evening or early morning. When he was ready to leave, he went upstairs and observed Cheyenne asleep on [Ifill's] chest with her hand on his penis. Santiago and [Ifill] left the residence. During a[ police] interview …, Santiago stated that [Ifill] mentioned having sexual intercourse with Cheyenne while she was on her period.

Adma Arvelo [nicknamed "China"] is the owner of the home in which the assault on Cheyenne took place. China stated that Cheyenne became too intoxicated and vomited. China told her to take a shower and lay down. China took Cheyenne upstairs, [p]ut her in the bathroom, then went back downstairs. China testified that Cheyenne called [Ifill] to come upstairs. China went back upstairs to the bathroom and observed Cheyenne in the bathtub with [Ifill] in the bathroom. Cheyenne stated to China "it's cool, we're just talking." China also testified that she heard [Ifill] and Cheyenne having intercourse. When China went back upstairs, [Ifill] exited the bathroom and China made sure that Cheyenne got dressed for bed. In conversations that took place after that night, [Ifill] stated to China that he had sexual intercourse with Cheyenne.

Nicole Baselj (hereinafter, "Nurse Baselj") examined Cheyenne on October 17, 2016. Cheyenne indicated to Nurse Baselj that she was intoxicated at the time of the incident and that she did not remember what happened. Nurse Baselj testified that, in her experience as a SAFE nurse, it is not likely that date rape drugs will show up in a drug panel as those specific types of drugs can stay in the system for as little as six … to twelve … hours. Nurse Baselj included in her records that Cheyenne showered, used the bathroom, and changed her clothing prior to the SAFE exam. Nurse Baselj also indicated in her report that a tampon was removed during the exam.

Trial Court Opinion, 3/17/22, at 2-6 (footnotes and record citations omitted).

Then, in summarizing what had happened in the separate incident, which occurred exactly one year later:

On October 15, 2017, Rachel Elliot (hereinafter, "Rachel") and Lindsey Taylor (hereinafter, "Lindsey") went to Joe K's Brewhouse at around 10:00 p.m. Rachel and Lindsey both knew

[Ifill] personally. On that night, [Ifill was] sitting with them at the brewhouse. At some point during the night, Rachel, Lindsey, and [Ifill] drove back to Lindsey's home. Rachel and Lindsey testified that Lindsey had been drinking too much. Lindsey fell while attempting to walk up the stairs to her apartment. Rachel also testified that she should not have been driving as she had been drinking too much as well. Lindsey further testified that she had never felt that level of intoxication before, but that she did not drink enough to feel that way. Rachel testified that she was impaired enough that she felt she could not stand straight. Once inside Lindsey's apartment, Lindsey vomited. Lindsey was not coherent and was not speaking at this point. Lindsey fell asleep on her couch while Rachel went to Lindsey's bed to sleep. Prior to going to bed, [Ifill] and Rachel kissed. When [Ifill] attempted to touch Rachel underneath her shirt, Rachel told him she did not want that.

After going to bed, Rachel remembers [Ifill] coming to the bed and saying to her "let me taste you." The next thing Rachel remembers is being on her back while [Ifill] penetrated her with her pants and underwear around her ankles. Rachel told him "no" and "stop, I don't want this." [Ifill] kept penetrating her. Rachel began pushing him off again and he said "fine" and stepped away. [Ifill] went into the living room and Rachel fell back asleep. Lindsey testified that she woke up on the couch to [Ifill] penetrating her while on top of her body. She pushed him away and ran into the bathroom. While crying in the bathroom, [Ifill] knocked on the door. [Ifill] stopped knocking after Lindsey did not open the door. When he walked away from the door, Lindsey exited the bathroom and crawled into bed with Rachel.

Rachel and Lindsey woke up the next morning with [Ifill] in the bed with him. [Ifill] left the apartment soon after. Rachel then left the apartment without talking to Lindsey about [Ifill]. That same day, Lindsey called Rachel and told her [Ifill] had raped her. Rachel told Lindsey that [Ifill] had raped her as well. Rachel and Lindsey then contacted the police and went to the hospital for a SAFE exam. Both Rachel and Lindsey agreed to contacting [Ifill] while being recorded.

Prior to the contact initiated by police, [Ifill] contacted Lindsey through [the social media application] Snapchat in a message that stated:

Lindsey, I'm so fucking sorry!!!! I don't remember and Rach just told me. It's absolutely unacceptable. I am so sorry. I really hope to be forgiven and for us to be able to speak about it and get [it] off of our chest. I'm so ashamed of what I did. I'd appreciate it if we kept it between us, and if not I understand. Please get in touch with…

Faith Mong (hereinafter, "Nurse Mong") completed the SAFE exam on Rachel and Lindsey on October 16, 2017. Nurse Mong testified that Rachel's exam took place approximately twenty-four … hours after the assault occurred. Most substances in the body would have been removed by that point. Rachel had a tear down in the posterior fourchette, or the bottom part of the vaginal orifice. Rachel had showered, urinated, defecated and changed her clothing prior to the exam. Rachel also indicated that she did have consensual intercourse in the prior five … days. Lindsey indicated to Nurse Mong that she had showered, brushed her teeth, changed her clothing, and urinated prior to the examination. Lindsey indicated that she did not have sexual intercourse in the prior five … days. Lindsey did not have tears present in or around the vaginal area.

Kelsey Gober (hereinafter, "Ms. Gober"), a forensic scientist, prepared DNA samples from the evidence collected during Rachel and Lindsey's SAFE exams. Ms. Gober did not find any seminal materials in the swabs; however, the vaginal swabs were sent for DNA testing. Cheslie Weaver, [also] a forensic scientist, performed the technical review of the DNA testing results in this case. Lindsey's vaginal swabs showed two individuals, Lindsey and another person. However, the component was too small to make a determination. Rachel's vaginal swabs showed two individuals, Rachel and a male. This DNA sample retrieved from the vaginal swabs is a partial DNA profile. The results partially matched to the known DNA sample from [Ifill;] however, as Ms. Gober testified to, [Ifill] cannot be definitively linked nor excluded as a contributor of the DNA.

Jeffrey Corcoran (hereinafter, "Detective Corcoran") became involved in this case after Rachel and Lindsey came to the police department to give statements. Upon learning that potential DNA evidence was collected, Detective Corcoran obtained a buccal swab from [Ifill]. Rachel and Lindsey provided conversations that took place over text message. Rachel asked

[Ifill] if he was aware that he attempted to have sexual intercourse with both Rachel and Lindsey and that it was not consensual. [Ifill] replied with an apology. Rachel asked if [Ifill] remembered, and [Ifill] replied that he did not remember why he was at Lindsey's home. [Ifill] also told Rachel to tell Lindsey that he was sorry. Rachel told [Ifill] that he raped both of them and [Ifill] stated that it was unacceptable and that he apologizes. He then asked for Lindsey's phone number so that he could apologize to her. He asked Rachel who all knew about the incident and Rachel answered that only Lindsey and Rachel knew. [Ifill] then asked Rachel to keep this incident between them. [Ifill] stated that what he did was not right and that he was ashamed of what he did. He further stated that it was a horrible mistake and that he would do whatever it takes to be forgiven.

*Id*., at 6-9 (footnotes and record citations omitted).

After a jury found Ifill guilty of the above-mentioned offenses, the lower court, contemporaneous with sentencing, considered whether Ifill should be classified as a sexually violent predator:

The Commonwealth received a report on June 22, 2021, completed by Dr. Robert Stein (hereinafter, "Dr. Stein"). Dr. Stein indicated in the report that [Ifill] met the criteria to be classified as a sexually violent predator. [Ifill] did not provide any type of expert testimony to rebut Dr. Stein's conclusions. [Ifill] further stipulated to the report that was completed by Dr. Stein. As both parties stipulated to the report, no testimony was taken, and the [c]ourt accepted arguments from both parties. [Ifill] argued that the Commonwealth did not provide definitive evidence of non-consensual arousal because [Ifill] may have been intoxicated as well. He further argued that the Commonwealth did not provide definitive evidence that [Ifill] demonstrated predatory behavior. [Ifill's] argument in support of this assertion was that predator behavior relates to defendants who target women with young children and not those who were drinking with others of the same age.

The Commonwealth [argued] that [Ifill] had an opportunity after the first scenario to step back and reflect and to either seek out treatment or become self-aware of what he had done to the first victim. Instead, [Ifill] again assaulted two additional women

a year later. Further, the Commonwealth argued that the jury found [Ifill] guilty of rape and sexual assault, thus finding that the assaults occurred without the victims' consent.

*Id.*, at 10 (record citations omitted). Ultimately, the court adjudicated Ifill to be an SVP.

After receiving the aforementioned twenty-two and one-half to forty-five year term of incarceration, Ifill filed a post-sentence motion, which was denied. Thereafter, Ifill filed a timely notice of appeal from his judgment of sentence. Additionally, the relevant parties have complied with their respective obligations pursuant to Pennsylvania Rule of Appellate Procedure 1925. Accordingly, this matter is ripe for review.

On appeal, Ifill presents seven issues for review:

1. Did the trial court err in permitting the Commonwealth to join Ifill's two docket numbers together and further by denying his motion for severance?

2. Was the evidence sufficient to convict Ifill of rape of an unconscious victim, as the Commonwealth failed to prove beyond a reasonable doubt that Cheyenne was either unconscious or unaware that sexual activity was occurring without her consent?

3. Was the evidence sufficient to convict Ifill of sexual assault, as the Commonwealth failed to prove beyond a reasonable doubt that sexual intercourse occurred against Cheyenne's consent?

4. Was the evidence sufficient to convict Ifill of two counts of rape of an unconscious victim and two counts of sexual assault as to Rachel and Lindsey?

5. Did the Commonwealth prove by clear and convincing evidence that Ifill is a sexually violent predator?

6. Is the sentence that was imposed manifestly excessive and

unreasonable?

> 7. Were Ifill's rape of an unconscious victim and sexual assault convictions as to Cheyenne against the weight of the evidence?

Appellant's Brief, at 6-7.[2]

In his first issue, Ifill contests the Commonwealth's request to, and court's subsequent acquiescence in, joining both of his dockets together for trial purposes. We conclude that Ifill has failed to demonstrate that the court erred in this particular instance.

Preliminarily, we note that "[w]hether to join or sever offenses for trial is within the trial court's discretion and will not be reversed on appeal absent a manifest abuse thereof, or prejudice and clear injustice to the defendant." **Commonwealth v. Knoble**, 188 A.3d 1199, 1205 (Pa. Super. 2018) (citation omitted).

Substantively, "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Pa.R.E. 404(b)(1). However, "[o]ffenses charged in separate indictments or informations may be tried together if … the evidence of each of the offenses

---

[2] We have reordered the issues to correspond with their respective positions in the argument section of Ifill's brief. However, the seventh claim, challenging weight of the evidence, does not appear to have been argued in the argument section. Correspondingly, that claim as been waived. **See Commonwealth v. Spotz**, 716 A.2d 580, 585 n.5 (Pa. 1999) ("[Our Supreme Court] has held that an issue will be deemed to be waived when an appellant fails to properly explain or develop it in his brief.") (citation omitted).

would be admissible in a separate trial for the other and is capable of separation by the jury so that there is not danger of confusion[.]" Pa.R.Crim.P. 582(A)(1)(a). Specifically, cross admissibility may occur to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Pa.R.E. 404(b)(2) (requiring, further, that the probative value of such evidence outweigh its potential for unfair prejudice).

As correctly illuminated by Ifill, courts are to employ a three-part consideration in order to ascertain whether joinder or severance is appropriate. Courts must determine:

(1) whether the evidence of each of the offenses would be admissible in a separate trial for the other;

(2) whether such evidence is capable of separation by the jury so as to avoid danger of confusion; and, if the answers to these inquiries are in the affirmative,

(3) whether the defendant will be unduly prejudiced by the consolidation of offenses.

**Commonwealth v. Brookins**, 10 A.3d 1251, 1256 (Pa. Super. 2010) (formatting altered) (citations omitted).

Here, the lower court "found that the two inciden[t]s would be admissible in a separate trial for the other as the inciden[t]s show a common plan, intent, preparation, knowledge, and absence of mistake." Trial Court Opinion, 3/17/22, at 12. To fit the "common plan" exception:

the Commonwealth must show more than that the other crimes are of the same class as the one for which the defendant is being tried. Rather, there must be such a high correlation in the details of the crimes that proof that the defendant committed one makes

- 10 -

it very unlikely that anyone else but the defendant committed the others.

***Commonwealth v. Kasko***, 469 A.2d 181, 184 (Pa. Super. 1983) (citation omitted). Explained further, "both crimes must be so nearly identical in their unusual or distinctive aspects as to bear the 'signature' or to be the 'handiwork' of the same person." ***Id***., at 184-85 (citation omitted). Conversely, "[s]imilarities cannot be confined to insignificant details that would likely be common elements regardless of the individual committing the crime." ***Commonwealth v. Bidwell***, 195 A.3d 610, 618-19 (Pa. Super. 2018) (citation omitted).

Ifill asserts that the court erroneously predicated its joinder determination on generic facts that are present in a lot of sexual assault cases. In particular, Ifill summarizes the correlative details between the two incidents: (1) the victims were "unconscious" at the time the sexual assaults were committed: (2) the assaults occurred in a "party environment"; and (3) the victims were concerned they had been drugged. ***See*** Appellant's Brief, at 28. Ifill then discusses how "[i]ntoxicants play a significant role in most acquaintance-rapes." ***Id***., at 28-29 (remarking, further, that use of involuntary intoxicants are present in thirty-three percent of sexual assault cases) (citation omitted).

To demonstrate the inappropriateness of the court joining his two dockets together, Ifill relies on ***Kasko***, *supra*. Therein, that appellant was alleged to have sexually molested his girlfriend's six-year-old niece in the

presence of the girlfriend on or about February or March of 1980. *See Kasko*, 469 A.2d at 183. Additionally, the appellant was alleged to have engaged in similar sexual misconduct between December 1980 and January 1981 with another victim: the four-year-old daughter of his step-sister. *See Id*. During that same timeframe, Appellant also encouraged "corruption" of this step-sister's daughter by "teaching or encouraging" her to have indecent contact with the five-year-old son of appellant's other step-sister. *Id*., at 184-85. These latter incidents "were not alleged to have been committed in the presence of appellant's girlfriend or any other adult." *Id*., at 185. The crimes stemming from both events were tried together.

Ultimately, on appeal, the *Kasko* panel determined that while the two cases had "certain similarities," the court should have severed the cases. In particular, there was a substantial period of time between the two events, they involved different victims, the one occurred in the presence of appellant's girlfriend while the other assaults did not, they involved victims of different sexes, and, finally, the misconduct was, in the Court's determination, a common form of child abuse. *Id*.

Apply the *Kasko* holding to the present facts, Ifill states that nothing between the two cases demonstrates a "common scheme." Appellant's Brief, at 31. Whereas Rachel and Lindsey were both sleeping before the assault, Cheyenne was awake during the sexual encounter. Moreover, the prologue to each incident was different: Rachel and Lindsey were with Ifill at a bar and

invited him back to Lindsey's residence. Conversely, Cheyenne arrived at a house where Ifill had already been.

Finally, Ifill asserts that the court failed to analyze whether consolidation's probative value outweighed the prejudice he would face. Instead, consolidation acted to "shield weaknesses in the Commonwealth's cases and to suggest that, based on the number of accusers alone, the contact had to be unwanted." Appellant's Brief, at 32. In effect, consolidation "stripped Ifill of his presumption of innocence." *Id*.

In *Commonwealth v. Smith*, 47 A.3d 862 (Pa. Super. 2012), the defendant challenged the consolidation of charges, which asserted that he raped two minors. *See* 47 A.3d at 863, 866. In affirming the lower court's consolidation determination, the *Smith* Court summarized the following cases:

> In [*Commonwealth v. Newman*, 598 A.2d 275 (Pa. 1991)], the Pennsylvania Supreme Court held that consolidation was proper where: 1) both rapes occurred in the x-ray department; 2) each occurred late at night when [the defendant] was the only technician on duty; 3) both victims were females suffering from head injuries; 4) both victims were half the size of [the defendant]; 5) [the defendant] began kissing the victims, hugging the victims, and fondling the victims' breasts before climbing onto the examination table and raping them.
>
> In [*Commonwealth v. Keaton*, 729 A.2d 529 (Pa. 1999)], the Pennsylvania Supreme Court again held that consolidation was proper where:
>
> > 1) the offenses were committed over a period of less than six months; 2) each was committed at night; 3) in each case, [the defendant] forced his victim into an abandoned house; 4) the abandoned houses were all in the same

neighborhood in which [the defendant] and the victims lived; 5) the abandoned houses were within a two-block radius of each other; 6) each offense involved a combination of bondage or strangulation of the victim; 7) each offense involved the rape of the victim; and 8) all victims shared similar personal characteristics: all were black females in their late twenties or thirties, all were acquainted with [the defendant], and all were crack cocaine addicts.

In [**Commonwealth v. Hughes**, 555 A.2d 1264 (Pa. 1989)], the Pennsylvania Supreme Court found that the crimes shared sufficient similarities in their details warranting consolidation, where:

1) both crimes involved young females; 2) both victims were non-Caucasian; 3) both crimes occurred during the daytime; 4) both crimes took place within a four-block radius; 5) both crimes took place within a five-minute walk from [the defendant's] home; 6) both crimes involved circumstances in which the victim was lured or strong-armed off the street; 7) both victims were taken to upstairs bedrooms of vacant buildings; 8) in both crimes [the defendant] ordered the victims to undress; 9) both crimes involved rape, other sex acts, and manual strangulation; and 10) both crimes involved circumstances in which [the defendant] and the victims previously were acquainted.

In contrast, the Supreme Court held that the details were not sufficiently similar to warrant consolidation where:

1) the victims were of totally different ages ...; 2) the weapons used were not identical; and, 3) nothing distinctive separated the two crimes involved from other street crimes[;] 4) the rape charged occurred in a garage while the other occurred in [the defendant's] apartment; 5) while both rapists wore sunglasses, the rapist here wore rose colored, light tinted sunglasses and, in the other he wore dark sunglasses; and, 6) the first rape also involved a robbery, violence by choking, and tying the victim, but there were no such incidents in the second rape.

**Commonwealth v. Patterson**, [399 A.2d 123, 127 (Pa. 1979)].

**Smith**, 47 A.3d at 867-68 (some citations omitted) (formatting altered). In

summary, the **Smith** Court remarked that "[o]ur Supreme Court previously has held that consolidation was appropriate where the ages and races of the victims were similar, where the assaults occurred close in time and at similar locations, where the assaults were achieved through similar means, and where the assaults involved similar crimes." **Id**., at 869 (citations omitted).

Synthesizing all of the abovementioned cases and in relying on the immediately preceding set of precepts, we hold that the slight differences between the two sexual assaults are vastly outweighed by their similarities. Accordingly, we find no abuse of discretion in the court's decision to consolidate the dockets.

We acknowledge that the genesis of each incident appears to be different, with Ifill having already been present when Cheyenne appeared at China's residence, which is in contrast to Ifill having been at a bar with Lindsey and Rachel before going back with them to Lindsey's house. However, that is where the material distinctions end.

First, we emphasize that Ifill has not argued that the victims, all females, were of a drastically different age or that their races were different from one another. Second, although the series of offenses occurred one year apart from each another, Ifill has not shown that this one-year separation inherently demonstrates the inappropriateness of consolidation, especially as both sets of crimes occurred on the *exact* same day, October 15th. Third, without Ifill raising any distance-related concerns, the locations are similar insofar as they

occurred at residences in the same county. Fourth, the sexual assaults occurred through similar means: during party environments featuring the consumption of alcohol. Fifth, the victims all strongly suggested during their testimonies that Ifill drugged them,[3] rendering them either completely unconscious or intoxicated to the point of legally establishing unconsciousness. **See, e.g.**, **Commonwealth v. Diaz**, 152 A.3d 1040, 1044-45 (Pa. Super. 2016) (finding that "unconsciousness" could be found in conjunction with a sexual assault when the victim was "blacking in and out," notwithstanding that victim remembering some of the events preceding and during the assault). Sixth, the assaults occurred late at night. With all of these circumstances in mind, the court did not abuse its discretion when it concluded that there was a high enough correlation between the two cases to demonstrate a common plan, scheme, or design. As such, the evidence of the offenses at both dockets would have been admissible in a separate trial for the other. **See** Pa.R.Crim.P. 582(A)(1).

With regard to the prejudice component of the joinder calculus, the appellant "bears the burden of establishing [undue] prejudice." **Commonwealth v. Dozzo**, 991 A.2d 898, 901 (Pa. Super. 2010) (citation

---

[3] The evidence at trial highlighted the evanescent nature of "date rape drugs." Specifically, those types of drugs "come into the system within minutes and they can leave within … hours to … six hours to 12 hours depending on the type of drugs that is used." N.T., 4/5/21, at 170. As such, given that each occurred beyond that twelve-hour window of time, it was unlikely for any of the SAFE exams, here, to produce positive clinical indicia of such drugs.

omitted). Specifically, the prejudice must be "greater than the general prejudice any defendant suffers when the Commonwealth's evidence links him to a crime." *Id*., at 901 (citation omitted). Distilled down, prejudice refers to evidence that would either *only* show a defendant's propensity to commit crimes or, in effect, confuse the jury to the point of it being unable to separate the evidence it is presented. *See id*. (citation omitted).

As Ifill does not raise any concern regarding jury confusion, we solely focus on whether he successfully demonstrated undue prejudice. *See Brookins*, *supra*. We conclude that he has not. While the evidence presented by the Commonwealth implicated Ifill in the separate sexual assaults, "the admission of relevant evidence connecting a defendant to the crimes charged is a natural consequence of a criminal trial, and it is not grounds for severance by itself." *Commonwealth v. Lauro*, 819 A.2d 100, 107 (Pa. Super. 2003) (citation omitted). Notwithstanding the cross admissibility of evidence from both cases, Ifill baldly claims that, as a basis for prejudice, the Commonwealth sought consolidation because its cases were independently weak and further that the aggregation of evidence only showed his propensity to commit sexual assaults. Ifill has not cited any statements made by the Commonwealth evidencing such accusations, nor has he supported these suppositions with any authority. Given the aforementioned similarities between the crimes, we reiterate that the court did not abuse its discretion in finding that the facts at each docket fit squarely under the auspice of a common plan or scheme.

Consequently, Ifill has failed to show that he suffered from the heightened level of prejudice required to warrant reversal of the court's consolidation determination.

Ifill's next three claims "aver that the evidence was insufficient to convict Ifill of rape of an unconscious victim and sexual assault, in either docket." Appellant's Brief, at 33. For sufficiency claims, we apply a well-settled standard of review:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence.

*Commonwealth v. Antidormi*, 84 A.3d 736, 756 (Pa. Super. 2014) (quoting *Commonwealth v. Estepp*, 17 A.3d 939, 943-44 (Pa. Super. 2011)).

For rape of an unconscious person, the Commonwealth was required to prove, beyond a reasonable doubt, that Ifill engaged "in sexual intercourse with a complainant … who [was] unconscious or where the person knows that the complainant is unaware that the sexual intercourse is occurring." 18 Pa.C.S. § 3121(a)(3). Similarly, for sexual assault, the Commonwealth was

required to show that Ifill engaged "in sexual intercourse or deviate sexual intercourse with a complainant without the complainant's consent." 18 Pa.C.S. § 3124.1.

Ifill first delves into the assault involving Cheyenne. Ifill summarizes the lower court's rationale in its conclusion that the evidence was sufficient to find that the victim was unconscious and convict him at this docket. Specifically, as framed by Ifill, the court relied on: (1) the fact that Cheyenne was physically ill and vomiting at the time; (2) her lack of initial response when Jenna knocked on the bathroom door while she was in the bathroom with Ifill; (3) the "groggy" sound of her voice when she eventually did respond; and (4) her not remembering how she made her way into the bathroom, nor did she remember taking a bath. *See* Appellant's Brief, at 36 (record citations omitted). However, Ifill highlights that the testimony does not actually indicate *why* Cheyenne did not promptly respond when there was knocking at the bathroom door. In fact, the record shows that she eventually *did* respond.

Additionally, Ifill avers that "[t]here is no evidence anything illicit occurred in the bathroom." Appellant's Brief, at 37. Instead, the testimony shows China taking Cheyenne to the bathroom, Cheyenne calling for Ifill to join her, and then her and Ifill eventually ending up in a bedroom. *See id*., at 37-38 (record citations omitted). After Cheyenne and Ifill were in that bedroom, others in the residence, including China, heard noises coming from that room, which were understood to be sexual in nature. From these series

- 19 -

of events, in which Cheyenne specifically asked for Ifill's presence, Ifill argues that "Cheyenne was not unconscious at the time of the contact" and "she was aware of external events and consented[.]" *Id*., at 38. Ifill also mentions that Cheyenne took a picture the next morning with Ifill's shirt, further evidencing her consent to what had happened between her and Ifill.

We reiterate that the facts and circumstances of the situation involving Cheyenne need not preclude every possibility of innocence. *See Antidormi*, *supra*. Further, specifically apt to the present claim, the Commonwealth may prove unconsciousness by means of wholly circumstantial evidence.

As stated, *supra*, the element of unconsciousness can be legally satisfied if an individual is intoxicated. *See, e.g.*, *Diaz*, 152 A.3d at 1045 ("[The victim's] complete lack of awareness of the duration of the assault … indicates that she was not conscious throughout its entirety.") (citation omitted). Here, approximately one hour after arriving at China's residence, Cheyenne started to feel violently ill. *See* N.T., 4/5/21, at 71. She "started getting really sick, throwing up." *Id*. She also indicated that she needed to go to the hospital and was described as acting in an "hysterical" manner. *See id*. Cheyenne personally felt as though she could not sit up straight. *See id*., at 120. She did not remember how she arrived in the bathroom and had no memory of being in a bathtub or taking a bath. *See id*., at 122-23. Cheyenne did not remember anyone else being in the bathroom with her besides China. *See id*., at 125. While she was in the bathroom, Cheyenne was noted as sounding

"really groggy and out of it." *Id*., at 78.

After spending time in the bathroom, without any further recollection of events, Cheyenne only remembered "crashing into the pillow" contained on a bed in China's bedroom. *Id*., at 125. That following morning, upon waking up, Cheyenne did not recall speaking to anybody at China's residence, notwithstanding China's later testimony. *See id*., at 127. Subsequently, Cheyenne's worries about what had transpired the night before led to a SAFE exam being performed on her. During that exam, which uncovered a previously unknown tampon inside of her, Cheyenne believed Ifill had sex with her "because there's no reason why a tampon was shoved up [her] to the point that [she] couldn't feel it even when [she] went to the bathroom." *Id.*, at 132.

While he provides testimonial evidence that could have served to weaken the Commonwealth's case, Ifill does not provide any authority to distinguish Cheyenne's obvious level of impairment from other cases finding that unconsciousness encompasses the term intoxication. The record clearly shows that Cheyenne did not remember large parts of what happened upon arrival at China's residence. Notwithstanding testimony indicating some level of responsiveness or her having some, albeit minimal, recollection of events, the evidence, viewed in a light most favorable to the Commonwealth as verdict winner, supports the finding that she "was at all relevant times in such impaired physical and mental condition so as to be unable to knowingly

consent[.]" ***Commonwealth v. Erney***, 698 A.2d 56, 59 (Pa. 1997). As such, "her submission to intercourse was involuntary … [and was] therefore … sufficient to constitute rape of an unconscious individual." ***Id***. With Cheyenne being unconscious at all relevant points, the sexual interaction between her and Ifill was also inherently nonconsensual, too. As such, Ifill's sufficiency claim, as to this set of facts, fails.

In challenging the sufficiency of the evidence underpinning the other rape and sexual assault convictions, Ifill describes Rachel and Lindsey's testimony. However, although Ifill provides numerous record citations in this section of his brief, it is unclear what, exactly, Ifill is arguing, given his lack of concomitant authority serving to demonstrate insufficiency.

Ifill describes that Rachel was fine with him kissing her, but that she wanted him to stop when he began to touch underneath her shirt. ***See*** Appellant's Brief, at 40 (record citation omitted). Rachel then went back to Lindsey's bedroom. Ifill, at some point, followed Rachel back to the bedroom and subsequently began vaginally penetrating her with his penis. Although, throughout this interaction, she felt as though she could not stand straight, Rachel eventually "came to" and told Ifill to stop, which he did eventually.

As to Lindsey, who was located on her couch, she was "fuzzy" throughout the experience, but felt someone pulling off her pants. Appellant's Brief, at 41 (record citation omitted). Thereafter, through Lindsey's testimony, Ifill climbed on top of her and, like what had happened to Rachel, began to

vaginally penetrate her with his penis. Lindsey then pushed Ifill off of her and went to the bathroom. Ultimately, Lindsey, Rachel, and Ifill ended up in the same bed together, but Ifill left in haste the following morning when all three woke up.

Other than vaguely asserting that the evidence was insufficient as to these two victims, Ifill does not present any sort of argument that establishes *why* the evidence was insufficient. In fact, other than his brief mentioning that "[t]he SAFE exams did not reveal any genetic material associated with Ifill[,]" Appellant's Brief, at 41, the factual summary, which almost exclusively highlights Rachel and Lindsey's testimony, casts Ifill in an inculpatory light, showing that the victims did not consent, were at varying levels of intoxication or completely unconscious throughout the incident, and that he engaged in sexual intercourse with both of them. We "will not act as counsel and will not develop arguments on behalf of an appellant." ***Commonwealth v. Hardy***, 918 A.2d 766, 771 (Pa. Super. 2007). Therefore, without any compelling basis that would indicate the evidence was insufficient to find Ifill guilty of rape and sexual assaults as to these two victims, we find no validity to Ifill's sufficiency claim in this domain.

In his next claim, Ifill suggests that the Commonwealth failed to present sufficient evidence to adjudicate him an SVP.

Review of SVP status requires us to employ yet another well-settled standard of review:

The determination of a defendant's SVP status may only be made following an assessment by the [Sexual Offenders Assessment Board ("SOAB")] and hearing before the trial court. In order to affirm an SVP designation, we, as a reviewing court, must be able to conclude that the fact-finder found clear and convincing evidence that the individual is a sexually violent predator. As with any sufficiency of the evidence claim, we view all the evidence and reasonable inferences therefrom in the light most favorable to the Commonwealth. We will reverse a trial court's determination of SVP status only if the Commonwealth has not presented clear and convincing evidence that each element of the statute has been satisfied.

The standard of proof governing the determination of SVP status, i.e., "clear and convincing evidence," has been described as an "intermediate" test, which is more exacting than a preponderance of the evidence test, but less exacting than proof beyond a reasonable doubt.

* * *

The clear and convincing standard requires evidence that is "so clear, direct, weighty, and convincing as to enable the [trier of fact] to come to a clear conviction, without hesitancy, of the truth of the precise facts [in] issue."

*Commonwealth v. Fuentes*, 991 A.2d 935, 941–42 (Pa. Super. 2010) (*en banc*) (citations omitted).

Providing background to the SVP determination process:

After a person has been convicted of an offense listed in 42 Pa.C.S. § 9799.14, the trial court then orders an assessment to be done by the SOAB to help determine if that person should be classified as an SVP. An SVP is defined as a person who has been convicted of a sexually violent offense and who has a mental abnormality or personality disorder that makes the person likely to engage in predatory sexually violent offenses. In order to show that the offender suffers from a mental abnormality or personality disorder, the evidence must show that the defendant suffers from a congenital or acquired condition that affects the emotional or volitional capacity of the person in a manner that predisposes that person to the commission of criminal sexual acts to a degree that

- 24 -

makes the person a menace to the health and safety of other persons. Moreover, there must be a showing that the defendant's conduct was predatory. Furthermore, in reaching a determination, we must examine the driving force behind the commission of these acts, as well as looking at the offender's propensity to reoffend, an opinion about which the Commonwealth's expert is required to opine. However, the risk of reoffending is but one factor to be considered when making an assessment; it is not an independent element.

When performing an SVP assessment, a mental health professional must consider the following 15 factors: whether the instant offense involved multiple victims; whether the defendant exceeded the means necessary to achieve the offense; the nature of the sexual contact with the victim(s); the defendant's relationship with the victim(s); the victim(s)' age(s); whether the instant offense included a display of unusual cruelty by the defendant during the commission of the offense; the victim(s)' mental capacity(ies); the defendant's prior criminal record; whether the defendant completed any prior sentence(s); whether the defendant participated in available programs for sexual offenders; the defendant's age; the defendant's use of illegal drugs; whether the defendant suffers from a mental illness, mental disability, or mental abnormality; behavioral characteristics that contribute to the defendant's conduct; and any other factor reasonably related to the defendant's risk of reoffending. *See* 42 Pa.C.S. § 9799.24(b).

*Commonwealth v. Hollingshead*, 111 A.3d 186, 189-90 (Pa. Super. 2015) (some citations omitted) (formatting altered).

Ifill concedes that, prior to the court determining him to be an SVP, he stipulated to the report of Robert M. Stein, Ph.D. *See* Appellant's Brief, at 46. In that report, Dr. Stein concluded that "within a reasonable degree of professional certainty … Ifill *meets* the criteria to be classified as a [SVP.]" Sexually Violent Predator Assessment, 5/27/21, at 7 (emphasis in original). Ifill notes that the assessment also states that he has a mental abnormality

as it pertains to arousal from nonconsensual contact. Ifill contests this latter premise because "Cheyenne was neither unconscious nor unaware of the sexual contact[.]" Appellant's Brief, at 46. As to the other portion of the assessment that indicates Ifill could not control his urges to have sex with the victims, Ifill states that "[b]oth Rachel and Lindsey testified Ifill stopped contact when they asked him." *Id*., at 47 (record citations omitted). Therefore, Ifill "is able to control his 'urges' and is not aroused by non-consensual sex." *Id*.

We have already established, *supra*, that, from a legal perspective, Cheyenne was intoxicated to the point of unconsciousness when the events between her and Ifill transpired. Therefore, his argument that Cheyenne was not unconscious necessarily fails. With regard to Ifill's suggestion that Ifill was able to control his urges as it related to Rachel and Lindsey, such a contention is refuted by the record. When Lindsey was "pushing him off and saying no," N.T., 4/5/21, at 249, Ifill "didn't stop." *Id*. "He continued until [Lindsey] pushed him off of [her]." *Id*. As to Rachel, when she told Ifill to stop and pushed him off of her, Ifill said no and kept going until she "pushed him off again[.]" N.T., 4/4/21, at 216-17.

As both of the proffered reasons why the court made an erroneous SVP determinations hold no merit and, too, in the absence of any kind of direct factor-based refutation of the SVP assessment, we find that the court utilized sufficient evidence, satisfying the clear and convincing evidence standard, to

adjudicate Ifill an SVP.

In his final issue, Ifill argues, *inter alia*, that the court imposed a manifestly excessive sentence and failed to consider mitigating factors. Ifill's claim challenges the discretionary aspects of his sentence, so we employ the following standard of review:

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.
>
> The right to appellate review of the discretionary aspects of a sentence is not absolute, and must be considered a petition for permission to appeal. An appellant must satisfy a four-part test to invoke this Court's jurisdiction when challenging the discretionary aspects of a sentence.
>
> [W]e conduct a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence; (3) whether appellant's brief has a fatal defect[, **see** Pa.R.A.P. 2119(f)]; and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code.
>
> * * * *
>
> A substantial question will be found where an appellant advances a colorable argument that the sentence imposed is either inconsistent with a specific provision of the Sentencing Code or is contrary to the fundamental norms which underlie the sentencing process. At a minimum, the Rule 2119(f) statement must articulate what particular provision of the code is violated, what fundamental norms the sentence violates, and the manner in which it violates that norm.

*Commonwealth v. Zirkle*, 107 A.3d 127, 132 (Pa. Super. 2014) (citations omitted).

Here, Ifill has filed a timely notice of appeal, he has filed the requisite motion to preserve the issue on appeal, and through his inclusion of a facially appropriate 2119(f) statement, there is no fatal defect in his brief. Therefore, we proceed to Ifill's brief to ascertain whether he has raised a substantial question.

In total, Ifill's "substantial question" maintains that his aggravated-range sentence was manifestly excessive, that the court failed to properly explain why it imposed this aggravated-range sentence, that the court failed to consider mitigating factors, that the court imposed consecutive sentences, that the court violated the Sentencing Code by solely focusing on retribution, and that the court impermissibly relied on a fourth victim's impact statement who was not a party to the case. *See* Appellant's Brief, 47-49.

"[A]n averment that the court sentenced based solely on the seriousness of the offense and failed to consider all relevant factors raises a substantial question ... [and] an allegation that the court considered an impermissible sentencing factor raises a substantial question." *Commonwealth v. Macias*, 968 A.2d 773, 776 (Pa. Super. 2009) (internal citations omitted). Furthermore, a claim that "the trial court failed to consider relevant sentencing criteria, including the protection of the public, the gravity of the underlying offense and the rehabilitative needs of Appellant, as 42

Pa.C.S.[] § 9721(b) requires[,]" presents a substantial question for our review. **Commonwealth v. Riggs**, 63 A.3d 780, 786 (Pa. Super. 2012). With both of these cases as guideposts, we conclude that Ifill has presented a substantial question, and we proceed to review the merits of his claims.

This Court "shall vacate" a sentence if we find:

(1) the sentencing court purported to sentence within the sentencing guidelines but applied the guidelines erroneously;

(2) the sentencing court sentenced within the sentencing guidelines but the case involves circumstances where the application of the guidelines would be clearly unreasonable; or

(3) the sentencing court sentenced outside the sentencing guidelines and the sentence is unreasonable.

42 Pa.C.S. § 9781(c).

The gravamen of Ifill's sentencing argument is that the court improperly relied upon a fourth alleged victim's statement in crafting his sentence. Ifill points to the court's sentencing order, which prohibits him from, *inter alia*, contacting this fourth victim "who testified as part of the sentencing." Sentencing Order, 10/5/21, at 2 (unpaginated). In addition, although Ifill acknowledges that the court mentioned its review of a pre-sentence investigation ("PSI") report, "it did not reflect upon the mitigating factors and [his] characteristics[.]" Appellant's Brief, at 54. Instead, it imposed an aggravated-range sentence without reason. **See id**. Ifill then writes that he is capable of rehabilitation and was relatively young at the time the aggregate sentence was imposed. **See id**.

Preliminarily, we note that "where, as here, the sentencing court had the benefit of a [PSI] report, we can assume the sentencing court was aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors." **Commonwealth v. Rhoades**, 8 A.3d 912, 919 (Pa. Super. 2010) (citation and quotation marks omitted).

After observing the entire trial, reviewing the PSI, listening to the victim impact statements, and hearing mitigating evidence from those connected to Ifill, the court concluded an aggravated-range sentence was warranted. In effect, Ifill was sentenced to three consecutive terms of seven-and-one-half to fifteen years' incarceration at each of the rape offenses.

As part of the sentencing transcript, the court noted that "[Ifill] was able to manipulate and figure out exactly where he needed to be at all times. … Bait and switch doesn't even begin to classify what he did to these victims." Sentencing Hearing, 10/5/21, at 30. The court also relied upon "the factual circumstance … that these victims had all woken up and then tried to resist the defendant and he did not then listen to what they had indicated as well[.]" **Id**., at 35. Therefore, the court adequately explained why it placed Ifill's sentences in the aggravated range.

As to the relevance of a non-party victim impact statement, in its subsequent opinion, the court wrote that it "did not consider the victim impact statement of an alleged fourth victim when sentencing [Ifill]." Trial Court

Opinion, 3/17/22, at 16. When the Commonwealth provided the court with this alleged fourth victim's statement, it expressly indicated to the court that such a statement could not "be used in terms of the sentencing itself for the three named victims[.]" Sentencing Hearing, 10/5/21, at 9.

Under certain circumstances, such as "when a prior record score inadequately reflects a defendant's criminal background," a sentencing court may "consider unprosecuted criminal conduct" when imposing its sentence. *Commonwealth v. P.L.S.*, 894 A.2d 120, 131 (Pa. Super. 2006). However, "uncharged criminal conduct may not be used for sentencing purposes when the record is devoid of the necessary evidentiary link between the defendant and the uncharged prior conduct." *Id*.

In *P.L.S.*, the sentencing court considered a SOAB investigator's testimony wherein it was established that the defendant had admitted to another non-testifying investigator that he had abused two additional minor victims. *See id*., at 128.[4] Moreover, when asked by the testifying investigator whether he engaged in that additional sexual abuse, the defendant did not deny having made such a statement. *See id*.

This Court determined that the sentencing court was permitted to consider the investigator's testimony, which delved into prior, uncharged criminal conduct. First, it was noted that the sentencing court "was allowed to

---

[4] The defendant in *P.L.S.* had been convicted of sexually abusing his girlfriend's minor daughter.

rely upon the SOAB assessment information when imposing [its] sentence." *Id*., at 132. Second, "the evidence linking [the defendant] to these other crimes stood unrefuted. That evidence sprang from [the defendant's] own mouth and was confirmed by the victims." *Id*. As such, "the sentencing court was permitted to rely upon [the defendant's] admissions when it imposed [its] sentence." *Id*.

> In addition, … this sentence was increased beyond the guidelines not merely because [the defendant] could not be prosecuted for his abuse of the two other children. The sentencing court clearly found, based upon [the defendant's] abuse of those victims, that he was a threat to children and needed to be sentenced above the guidelines ranges for the protection of the public.
>
> Finally, even if [this Court] were to conclude that the uncharged conduct should not have been considered by the sentencing court, the court offered significant other support for sentencing in excess of the guidelines in this case. [The defendant] sexually abused his victim nearly weekly for two years. As the sentencing court noted, the effect of this ongoing sexual abuse was substantial and long-term. The court also was appalled that [the defendant] would abuse a child in retaliation against the child's mother and attempt to justify his actions on that basis.

*Id*., at 133 (citation omitted).

Similarly, in ***Commonwealth v. Vernille***, this Court concluded that "[i]t was not improper for the judge to consider [that] appellant's alleged involvement in other unlawful activity for which he was not charged, tried, or convicted[,]" because the appellant "admitted most of [the at-issue] facts" and the "information was contained in the presentence investigation report and was also developed at trial, during which time [the] appellant had ample opportunity to respond to the allegations." 418 A.2d 713, 719 (Pa. Super.

1980).

Here, information pertaining to the alleged fourth victim first made its appearance in the SOAB report, *see* Sexually Violent Predator Assessment, 5/27/21, at 3-4, and Ifill's counsel did not object to the report's admission into evidence. *See* Sentencing Hearing, 10/5/21, at 4. Thereafter, the Commonwealth introduced a written statement from the alleged fourth victim, which received an objection from Ifill's counsel. *See id*., at 9. That statement, *inter alia*, expressly accused Ifill of sexual assault. *See, e.g.*, *id*., at 10-11 ("I said no and told you to stop, but instead you became forceful and aggressive. You laughed until I was finally able to push you off of me and run out of the room.").

Contrary to **P.L.S.**, which involved the incorporation of uncharged and undenied allegations into an SOAB report, there does not appear to be any SOAB inquiry directed at Ifill to ascertain the veracity of this supposed victim's statement. Moreover, Ifill did not specifically admit to the behavior alleged by the putative fourth victim. When the statement against Ifill was admitted at the sentencing hearing, there is nothing more that Ifill's counsel could have done to deny his involvement in this untested accusation beyond making an objection, which is what, in fact, occurred. In addition, although the sentencing court had the benefit of a PSI, it does not appear that the alleged fourth victim's accusations were documented or reviewed for the purposes of that report. Furthermore, unlike **Vernille**, Ifill's involvement in uncharged

criminal activity was not, as best can be discerned, developed, or even alluded to, at trial. As such, because there was no opportunity for Ifill to contest or assent to this additional victim impact statement, Ifill's alleged sexual assault on a fourth victim should not have been considered by the court at sentencing.

Nevertheless, vacation of a sentence is only appropriate if the court relied upon an impermissible factor at sentencing:

> In deciding whether a trial judge considered only permissible factors in sentencing a defendant, an appellate court must, of necessity, review all of the judge's comments. Moreover, in making this determination it is not necessary that an appellate court be convinced that the trial judge in fact relied upon an erroneous consideration; it is sufficient to render a sentence invalid if it reasonably appears from the record that the trial court relied in whole or in part upon such a factor.

*Commonwealth v. Scott*, 860 A.2d 1029, 1030 (Pa. Super. 2004).

Although the court, here, disclaimed any utilization of the alleged fourth victim's impact statement, *see* Trial Court Opinion, 3/17/22, at 16,[5] it strains credulity to find that such a statement played *no* impact in its ultimate sentencing determinations. Specifically, the court, in its sentencing order,

---

[5] While the court relies on the statement of the Commonwealth attorney at the sentencing hearing that the fourth victim's impact statement victim impact statement would not be considered when sentencing Ifill, *see* Trial Court Opinion, 3/17/22, at 16 (citing Sentencing Hearing, 10/5/21, at 9), the court, itself, did not expressly disclaim its consideration of the fourth victim's statement either at the sentencing hearing or in its sentencing order. Moreover, it defies explanation as to what other purpose the reading of the victim impact statement at the hearing could possibly have served, as the court had already determined that Ifill was an SVP, *see* Sentencing Hearing, 10/5/21, at 8, and the only remaining matter for the court's consideration was Ifill's sentence.

referred to "all four victims," Sentencing Order, 10/5/21, at 2 (unpaginated) (prohibiting Ifill from contact with these individuals), notwithstanding the fact that there had been no adjudication of Ifill's guilt as to this fourth victim. Therefore, in light of the explicit consideration given to this untested fourth victim's impact statement, memorialized in the sentencing order, it reasonably appears from the record that the court relied on this impermissible factor in making its sentencing determination. While there may have been other reasons why the court imposed three sentences that were all in the aggravated range, the weight ascribed by the court to this impermissible factor is facially evident.

Consequently, because the court relied upon this impermissible factor in imposing three sentences that were all in the aggravated range, we vacate the judgment of sentence and remand for resentencing. As to all of the other issues raised by Ifill, we affirm.

Judgment of sentence vacated. Case remanded for resentencing. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/7/2023